IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK DeLaFONT, et al., )
)
Plaintiffs, )
)
vs. ) No. 02 C 5448
)
KAREN BECKELMAN, et al., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Patrick DeLaFont, Stacey DeLaFont and their children, Kristin, Kaitlyn and Patrick Jr., brought this action against defendants Karen Beckelman, a supervisor at the Illinois Department of Children and Family Services (DCFS), and Andrea Jones, a former DCFS investigator, alleging violations of their civil rights pursuant to 42 U.S.C. § 1983. Defendants have moved for summary judgment, arguing that no constitutional violations occurred, and even if they did, qualified immunity shields them from individual liability. For the following reasons, defendants' motion is denied.

## BACKGROUND

For purposes of the summary judgment motion, the facts below are taken from the parties' Local Rule 56.1 submissions, with pertinent conflicts noted.[1] Patrick and Stacey were long-term employees at a day care center, Cradles, Cribs and Crayons (Cradles), in Skokie, Illinois (defs' facts, ¶¶ 24-27). On January 4, 2001, Amelia B., a member of Patrick's classroom, told her mother, "Patrick put his hand on my boody" (id. at ¶ 29). The following

---

[1] The court has already set forth the factual background in several prior orders. See, e.g., DeLaFont v. Beckelman, 264 F. Supp. 2d 650, 653-55 (N.D. Ill. 2003); DeLaFont v. Beckelman, 2003 WL 21294741, 2003 U.S. Dist. LEXIS 9290 (N.D. Ill. 2003); DeLaFont v. Beckelman, 2003 WL 22239726, 2003 U.S. Dist. LEXIS 17029 (N.D. Ill. 2003).

day Amelia's mother conveyed that information to Ronna Cooper, the owner and operator of Cradles (*id.* at ¶¶ 31, 32). Cooper, a mandated reporter, is required to inform DCFS of any allegations or instances of child abuse or neglect. Cooper called the DCFS hotline at 10:25 a.m. on January 5, 2001, soon after speaking with Amelia's mother (*id.* at ¶ 33).

Beckelman was assigned to supervise the investigation, and she delegated the investigative duties to Jones, who at the time had the most experience with day care facility cases (*id.* at ¶ 34; defs' ex. 6 at 190). Beckelman and Jones discussed the case, and in a note signed by Beckelman and dated January 5, 2001, Beckelman instructed Jones to: "See the child at the day care. Put in a protection plan with the offender. Make sure he has no children. If he does also put in a plan in his home pending the interview. Make you complete all notifications within 24 hours" (plfs' facts ¶ 11). Jones then called Cooper at Cradles, and told her that Patrick had to leave immediately. Jones learned from Cooper that Stacey also worked at Cradles and that the DeLaFonts had three children (defs' facts ¶ 36). Approximately three hours after receiving the hotline call, Jones called Stacey and told her that during the investigation Patrick could not be around any children except for supervised visits (defs' ex. 4 at 44833). Defendants assert that Jones attempted to discuss a protection plan with Stacey, who denied the allegations against her husband and refused to discuss any plan (defs' facts ¶ 38). Plaintiffs contend that instead of discussing a plan, Jones told Stacey that Patrick had to leave the house and that if he failed to do so, DCFS would take custody of the children (plfs' facts ¶ 14). Patrick left his home on January 5, 2001.

On January 9, 2001, a forensic investigator conducted a victim-sensitive interview (VSI) with Amelia B. Jones observed the interview, but Beckelman was not present (defs' facts ¶ 44). The parties disagree as to the credibility of Amelia during the interview, but Jones found

it sufficient to continue her investigation (defs' facts ¶ 44; plfs' facts ¶ 15). On January 10, Beckelman called Stacey and told her that Amelia had made a statement of abuse against Patrick (defs' facts ¶ 45). Beckelman inquired into Patrick's whereabouts, and Stacey informed her that he had left pursuant to her January 5 conversation with Jones (defs' facts ¶ 45; plfs' facts ¶16). On January 12, Jones and another DCFS agent visited Cradles to view the classrooms, and they learned that Patrick and his co-teacher would take breaks during nap time, and how Patrick would lie next to the door, visible to all who passed by (defs' ex. 6 at 155-56). On January 15, 2001, Jones visited the DeLaFonts at their home, informed them of the statement of abuse made by Amelia, and interviewed the three DeLaFont children separately (defs' facts ¶ 49). All three children understood the difference between a "good touch" and a "bad touch," and they each said they had never received bad touches (plfs' resp. facts ¶ 49). Jones also completed substance abuse forms for Patrick and Stacey, but incorrectly dated those forms January 10, 2001 (defs' facts ¶ 49; defs ' ex. 4 at 44902-905, 70585-587). On January 31, Jones returned to Cradles and interviewed several children, none of whom reported receiving any abuse or "bad touches" from Patrick (defs' facts ¶ 50; plfs' resp. facts ¶ 50; defs' ex. 4 at 44857-64).

On February 5, 2001, Jones met with the DeLaFonts again, but this time at the DCFS office (defs' facts ¶ 51). The DeLaFonts continued to deny the allegations, but Jones informed them that the case against Patrick was being indicated, which meant that DCFS considered the allegations against him to be true; that he had to complete a sex offender assessment and could only have supervised contact with his children, which amounted to Sundays at church (defs' facts ¶ 52; plfs' resp. facts ¶ 52; defs' ex. 6 at 176). As a result of the indicated finding, Patrick's name was entered into the State Central Register (Register). The indicated finding

also meant that Patrick could no longer work with children, and consequently he lost his job at Cradles (defs' facts ¶ 53; defs' ex. 4 at 44870).

On March 30, 2001, DCFS sent Patrick a letter advising him of his appeal rights, and on May 3, 2001, Patrick requested an appeal of the indicated finding (defs' facts ¶¶ 57, 58). An administrative hearing was held, and on October 16, 2001, the administrative law judge ruled in Patrick's favor, observing that the investigation was "conducted in such a way that Amelia's statement remains the only evidence implicating appellant" and that the "investigation was at a minimum sloppy, and at worst the result of a pre-ordained conclusion" (plfs' ex. 1 at 9; defs' facts ¶ 63). On December 4, 2001, the DCFS director adopted the administrative law judge's findings of fact and conclusions of law, granted the appeal, and expunged the indicated finding (defs' facts ¶ 64; defs' ex. 4 at 70508). Plaintiffs' complaint consists of two counts. In count I, all plaintiffs claim that defendants deprived them of their constitutional right to familial relations when they ordered Patrick DeLaFont to leave his home without any legitimate governmental interest. In count II, Patrick claims that defendants deprived him of his right to a career opportunity without due process. In both counts plaintiffs allege that defendants engaged in intentional misconduct during the investigation. In their motion for summary judgment, defendants contend that they did not deprive plaintiffs of any constitutional rights. They further argue that even if any constitutional rights were violated, they are entitled to qualified immunity because the law was not clearly established.

## DISCUSSION

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c). We do not make credibility determinations nor weigh evidence when ruling on a summary judgment motion. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). Indeed, it is error to make credibility determinations at the summary-judgment stage. <u>Morfin v. City of E. Chicago</u>, 349 F.3d 989, 999 (7th Cir. 2003). Our only task is to "decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249. Facts and inferences are construed in the light most favorable to plaintiffs, the nonmoving parties. <u>Darnell v. Thermafiber, Inc.</u>, 417 F.3d 657, 659 (7th Cir. 2005).

Defendants argue that they violated no constitutional rights, and if any deprivations occurred, they are immune from personal liability. Their argument thus mirrors the two-step qualified immunity analysis. <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001). "The threshold inquiry is whether, taken in the light most favorable to the party asserting the injury, 'the facts alleged show the officer's conduct violated a constitutional right.'" <u>Doe v. Heck</u>, 327 F.3d 492, 509 (quoting <u>Saucier</u>, 533 U.S. at 201). If no constitutional right was violated, the inquiry ends. <u>Id</u>. However, if the parties' submissions show a constitutional right was indeed violated, then the next step asks whether the right was clearly established. <u>Id</u>. We turn to plaintiffs' allegation that defendants violated their right to familial relations.

Substantive due process encompasses a parent's liberty interest in familial relations. *See* <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000) (collecting cases); <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102, 116 (1996); <u>Brokaw v. Mercer County</u>, 235 F.3d 1000, 1018 (7th Cir. 2000) ("The Supreme Court has long recognized as a component of substantive due process the right to family

relations."). Children have a "corresponding familial right to be raised and nurtured by their parents." Berman v. Young, 291 F.3d 976, 983 (7th Cir. 2002). However, the right to familial relations is not without limits. It is bounded by the government's compelling interest in protecting children. Brokaw, 235 F.3d at 1019; Doe, 327 F.3d at 520 ("The right to familial relations is not, however, absolute."). For example, the right to familial relations "does not include the right to be free from child abuse investigations." Doe, 327 F.3d at 520. To determine if the state violated a party's constitutional rights, courts must balance "the fundamental right to the family unit and the state's interest in protecting children from abuse." Brokaw, 235 F.3d at 1019.

According to plaintiffs, on January 5, 2001, Jones told Stacey that Patrick had to leave the home and separate from his own children or else DCFS would take custody of the children (defs' ex. 7 at 161, ln 12-15 ("[Jones] told me that Patrick wasn't allowed to be in our home or around our children anymore. And that if I didn't listen to her that she was going to take my children away and ban me from day care."); defs' ex. 10 at 97, ln 17-21 ("[Jones] told me that Patrick had to leave our house. And I refused. And she told me that if I didn't cooperate with her that she was going to come and take my children away from me and ban me from day care.")). Supporting plaintiffs' position is the January 5, 2001, note signed by Beckelman, which instructed Jones to see if the DeLaFonts had children at home, and if they did, to institute a protection plan in their home. Plaintiffs claim that Jones ordered Patrick from his home despite the total absence of any allegations that Patrick mistreated his children, which under Brokaw tilts the balance of interests in their favor. See Brokaw, 235 F.3d at 1019 ("In balancing these competing interests, courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence

giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.").

Defendants claim that Jones called on January 5, 2001, to discuss implementing a safety plan, and never told Stacey that she could lose her children if Patrick did not leave the house (defs' ex 7 at 14-15). Defendants further contend that they did not know Patrick had left the home until January 10, 2001, one day after the VSI provided them with what they deemed to be reasonable suspicion that Amelia had been abused. However, that assertion conflicts with Beckelman's January 5 memo, and also with defendants' stated goal to separate Patrick from all children posthaste. Defendants emphasize that their investigation provided them with a reasonable basis to suspect, and ultimately "indicate" Patrick for child abuse. Even if defendants instituted the protective plan in the DeLaFont home only after the VSI, their investigation up to that point produced no evidence that Patrick abused his children. Further, the subsequent investigation yielded no evidence that the DeLaFont children were mistreated. To the contrary, the DeLaFont children specifically told Jones that they never received "bad touches" from their father. Yet, according to plaintiffs, Patrick was still banished from his home.

The record demonstrates that plaintiffs' interest in familial relations is far from nebulous, and the balance of interests does not tilt in defendants' favor. Brokaw, 235 F.3d at 1019, 23. The record does not show that plaintiffs' shared belief that DCFS could take custody of their children was unreasonable, distinguishing the case from Terry v. Richardson, 346 F.3d 781, 785, 87 (7th Cir. 2003) (holding the plaintiff's belief that DCFS could override a divorce decree to be unreasonable). When viewed in the light most favorable to plaintiffs, there is a genuine dispute as to whether defendants interfered in the parent-child relationship by

ordering Patrick to leave the house. *See* <u>Russ v. Watts</u>, 414 F.3d 783, 788 (7th Cir. 2005) (constitutional claim exists when government conduct is "specifically aimed at interfering with [the parent-child] relationship.").

Turning to the procedural due process component of count I, the inquiry involves two steps: "(1) whether the defendants deprived the plaintiffs of a constitutionally protected liberty or property interest; and (2) if so, whether that deprivation occurred without due process of law." <u>Doe</u>, 327 F.3d at 526. Plaintiffs allege that the deprivation occurred without any evidence that Patrick abused his own children, and without any pre- or post-deprivation procedures. Plaintiffs have thus addressed both prongs of the procedural due process analysis. *See* <u>Brokaw</u>, 235 F.3d at 1020 (quoting <u>Matthews v. Eldridge</u>, 424 U.S. 319, 333 (1976)) ("The Supreme Court has said that parental rights cannot be denied without an 'opportunity for them to be heard at a meaningful time and in a meaningful manner.'").

Challenging plaintiffs' procedural due process claim, defendants assert that their investigation produced a direct statement of abuse against plaintiff, exigent circumstances existed, no facts were misrepresented, and they did not forcibly remove Patrick. Defendants further contend that plaintiffs voluntarily agreed to the safety plan, and are therefore not entitled to any post-deprivation opportunity to challenge that plan. Defendants make these points to distinguish <u>Brokaw</u>, and presumably to address the third prong of the <u>Matthews</u> balancing test.

Plaintiffs dispute each of defendants' assertions. According to plaintiffs, the statement of abuse had no bearing on Patrick's relationship with his children. Further, no exigent circumstances existed in the DeLaFont household that justified Patrick's banishment. Plaintiffs also contend that defendants intentionally made misrepresentations during the

investigation, such as misdating the substance abuse forms. Plaintiffs stress that Jones effectively forced Patrick out of his home when she threatened taking custody of the DeLaFont children if he remained. With respect to defendants's waiver claim, plaintiffs assert that they never accepted a safety plan because no plan existed. Plaintiffs state that there was a banishment directive instead of a safety plan. The record reflects myriad factual disputes, rendering summary judgment improper. At bottom, there is a factual dispute as to whether defendants ordered Patrick out of his home, and if they did, whether their actions were justified without offering plaintiffs an opportunity to challenge the order.

The court has already determined that Patrick stated a constitutional claim in count II for deprivation of a career opportunity. DeLaFont, 264 F. Supp. 2d at 659. Entry into the Register is a virtual blacklisting in the child care field. Patrick had no pre-deprivation opportunity to challenge the indicating finding. For reasons related to the procedural due process component of count I, count II sufficiently describes a constitutional violation to survive summary judgment.

Having found that both counts state constitutional claims, we turn to the second prong of the qualified immunity analysis and ask whether the law was clearly established. Defendants invoke qualified immunity, and plaintiffs must therefore show that the law is clearly established. Gossmeyer v. McDonald, 128 F.3d 481, 495-96 (7th Cir. 1997). Plaintiffs may meet their burden by pointing to analogous case law. See Brokaw, 235 F.3d at 1022; Morrell v. Mock, 270 F.3d 1090, 1100 (7th Cir. 2001) (to show that a law was established, "a plaintiff may point to closely analogous cases establishing that the conduct is unlawful"). Plaintiffs may also show that the "violation is so obvious that a reasonable state actor would know that what he is doing violates the Constitution." Morrell, 270 F.3d at 1100.

Plaintiffs correctly note that the court has already addressed this issue. In denying defendants' motion to dismiss on qualified immunity grounds, the court concluded that Brokaw represented clearly established law. See DeLaFont, 264 F. Supp. 2d at 656 ("The events in question occurred in January 2001, after the Brokaw decision."). The record presents no cause to abandon that conclusion. See Landstrom v. Illinois Dep't of Children & Family Services, 892 F.2d 670, 674 (7th Cir. 1990) ("qualified immunity turns on what is essentially a legal issue: the status of the legal norms allegedly violated by the defendants."). It is true that Brokaw specifically dealt with the removal of a child from the home, but we view the removal of a parent to be sufficiently analogous because it also represents the destruction of the family unit. Here there was actual separation, and not merely a threat, distinguishing this case from Doe, 327 F.3d at 526. Further, plaintiffs do not simply challenge the credible evidence standard, but claim that defendants removed Patrick without any evidence that he abused his children, or that they were in danger. Yet defendants argue that Brokaw is inapposite because they only acted against plaintiffs after Amelia made a statement of abuse against Patrick at the VSI. As discussed above, this is a contested point, and the plaintiffs state that Patrick was ordered from his home four days before the VSI. Defendants' qualified immunity defense still fails.

The court also held that the constitutional violation stated in count II was not entirely based on clearly established law because Doyle v. Camelot Care Centers, 305 F.3d 603 (7th Cir. 2002) and Dupuy v. McDonald, 141 F. Spp. 2d 1090 (N.D. Ill. 2001) were decided after the allegedly violative conduct took place. See DeLaFont, 264 F. Supp. 2d at 659. The court noted that qualified immunity would apply because defendants could not reasonably know that by entering Patrick in the Register he could not reasonably pursue his career. But, we

also noted that plaintiff alleged intentional wrongdoing against defendants, and that allegation defeated the immunity defense. Plaintiffs claim that defendants intentionally manipulated the investigation, and point to the incorrect date on the substance abuse form, the inaccurate physical description of the DeLaFont children, the decision to credit the VSI even though Amelia often contradicted herself (*see* defs' ex. 4 at 45010-014), and the decision not to interview several people, such as Patrick's co-teacher, Martha Lang. Defendants depict their investigation as reasonable, and describe any errors to be simple and innocuous.

Taken individually, the evidence plaintiffs cite could indicate only a shoddy investigation. For example, the inaccurate description of the DeLaFont children (Jones described two as having blonde hair, when all three have dark hair, *see* defs' ex. 4 at 44852-53) is easily refuted and could not carry any weight in determining whether Patrick mistreated his children or the alleged victim. When the separate instances are taken together, and perhaps more importantly, when they are viewed in light of the entire investigation, they could create the impression that defendants intentionally manipulated the record and fabricated evidence to secure an indicated finding against Patrick. Or they could not. Whether they actually do is an issue for a jury to decide. The parties hotly contest many material factual events and summary judgment is inappropriate.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied.

                                                    JAMES B. MORAN
                                                    Senior Judge, U. S. District Court

Oct. 25, 2005.